UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

ANN MARIE HILL,

                    Plaintiff,

v.                                                        Case No:  6:15-cv-890-Orl-28DCI

SUNTRUST BANK,

                    Defendant.
_____

## ORDER

Ann Marie Hill brings the instant action against her former employer, SunTrust Bank,

alleging that SunTrust violated 42 U.S.C. § 1981 by terminating her based on her race and

in retaliation for complaining about discrimination.  Before the Court is SunTrust's Motion

for Summary Judgment (Doc. 31).[1]  As set forth below, SunTrust's motion is granted as to

both of Hill's claims.

I.     **Background**

Hill, who is African-American, worked from SunTrust from November 1981 until she

was terminated in April 2011.  She was hired as a customer service representative and

later worked in positions including new accounts representative, account executive,

personal banker, and business banking relationship manager (BBRM), assuming this last

role in 2003.  (Hill Dep.[2] at 21–28; Ex. 2 to Hill Dep.).

When Hill became a BBRM, the job entailed providing services to small business

---

[1] Hill filed a Response (Doc. 32) to the motion, and SunTrust filed a Reply (Doc. 33).
[2] Hill's deposition and the exhibits thereto are filed at Docs. 31-1 through 31-5 of the electronic record.  Citations are to the deposition page numbers rather than to page numbers in the electronic record.

customers regarding checking accounts, savings accounts, CDs, money markets, and loans. (Hill Dep. at 30). By 2008, the BBRM position had changed in duties but not in title. (Id. at 31). BBRMs "were to do larger loans," more calling on businesses, and more "external activity." (Id. at 44–45). As part of the change in the BBRM position, Hill and other BBRMs had specific goals issued to them with regard to categories of tasks they were required to complete each year. (Id. at 45).

In 2008 and 2009, Hill reported to Commercial Team Lead Robert McCollum, who is Caucasian. In her 90-day review for January through March 2008, McCollum gave Hill an overall performance rating of 2 out of 5, noting development goals including "[m]eet and obtain production goals," "[i]mprove production results," and "[s]et time on . . . calendar to outbound for one hour in the morning and afternoon each day." (90-Day Review, Ex. 9 to Hill Dep., at 5 & 8). McCollum again rated Hill as a 2 out of 5 overall on her mid-year 2008 review, noting that Hill achieved only one of her five production goals and was ranked #511 in the "SunTrust Cup," which charts the performance of SunTrust BBRMs on a "leaderboard." (Ex. 10 to Hill Dep. at 2 & 5; Hill Dep. at 65–67 (describing the SunTrust Cup)). McCollum further noted that Hill "did not prospect as needed and had no additional loans in her pipeline." (Ex. 10 to Hill Dep. at 2). Areas noted for development were "[i]mprove focus on obtaining production goals" and "[i]ncrease the number and frequency of calling activities." (Id. at 5).

McCollum gave Hill an overall rating of 3 out of 5 on her 2008 Annual Review, noting that she achieved two of five production goals for the year and was ranked #167 in the SunTrust Cup—improving from #511 at mid-year. (Ex. 11 to Hill Dep. at 2 & 5). McCollum again noted as areas for development improved focus on meeting production goals and

increasing calling activities.  (Id. at 5).  On September 8, 2009, McCollum gave Hill a 2 out of 5 overall rating on her 2009 mid-year review and encouraged her to read a sales book "as a resource for growing her sales skills."  (Ex. 12 to Hill Dep. at 4 & 6).  McCollum again gave Hill an overall 2 out of 5 rating on her 2009 annual review, noting that Hill "did not obtain her production goals in 2009" and finished #408 in the SunTrust Cup.  (Ex. 13 to Hill Dep. at 2 & 5).

In January 2010, Christopher Kendall began working for SunTrust as a Commercial Banking Manager, and Hill began reporting to Kendall, who is Caucasian.  (Kendall Decl., Ex. B to Mot. Summ. J., ¶¶ 2–3).  On Hill's 2010 mid-year evaluation, which was completed on August 20, 2010, and covered January through June 2010, Kendall gave Hill an overall performance rating of 2 out of 5.  (Ex. 15 to Hill Dep. at 5).  Kendall noted that Hill did not meet several of her production goals, that she "ranked 337th in the SunTrust Cup, placing her in the 5th quintile," and that her "performance is well below where she needs to be to succeed in her role."  (Id. at 2).  Kendall further noted:  "Given her tenure and experience, [Hill] should be meeting her production goals on a more consistent basis."  (Id. at 5).

On August 20, 2010—the same day that Hill's mid-year review was completed—Kendall placed Hill on "Verbal Warning," the first step of a Corrective Action Plan, to last until September 30, 2010.  (Ex. 16 to Hill Dep.).  Both Kendall and his supervisor, Randy Chesak, signed the Corrective Action Plan document.  (Id. at 3).  That document noted that Hill met one performance goal but achieved only 13%, 67%, 1%, 26%, 21%, and 6% of other goals.  (Id. at 1).  The Verbal Warning imposed performance requirements of:  three commercial loan applications greater than $100,000 per month; four new non-interest demand deposit accounts opened per month; four new business deposit opportunities per

3

month; five prospect calls out of the office per week; and twelve client calls per week. (Id. at 2).

Effective October 19, 2010, Kendall placed Hill on "Written Warning"—the next Corrective Action step. (Ex. 17 to Hill Dep.). Kendall noted that Hill failed to meet performance measures and continued to rank in the bottom of the fourth quintile in the SunTrust Cup—313th on August 17, 2010, and 309th on September 30, 2010. (Id. at 1). With regard to the performance requirements imposed in the Verbal Warning, Hill obtained four commercial loan applications greater than $100,000 for August and one for September, but none were completed past "Stage 3"; Hill obtained only two non-interest demand deposit accounts in August and none in September; Hill obtained no new business deposit opportunities in August and only three in September; Hill completed nine out-of-office prospect calls in August and fourteen in September; and Hill completed sixteen client calls in August and sixty-one in September. (Id.). The Written Warning repeated the same performance requirements as had the Verbal Warning and also required Hill to: meet 33% of her quarterly production goals by the end of November in the categories of new business demand deposit accounts, new business other deposits, loan/other fees, and new business loans; and identify and close two new primary relationships by the end of November. (Id. at 2).

On February 21, 2011, Kendall placed Hill on probation effective February 16, 2011, with an anticipated end date of March 16, 2011. (Ex. 21 to Hill Dep. at 2). The document imposing probation noted that Hill failed to meet performance measures and continued to rank in the bottom of the fourth quintile of the SunTrust Cup—304th on December 31, 2010. (Id. at 1). Hill did not obtain three commercial loan applications greater than $100,000 per

month; did not meet the goals for new non-interest demand deposit accounts or new business demand deposit opportunities; and did not make five out-of-office prospect calls per week in any month. (Id. at 2). She achieved in excess of the 33% of goal in November in some areas but not in others. (Id.). The Probation document noted that "[i]mmediate and sustained performance improvement is required." (Id.).

Hill's annual evaluation for 2010 was completed on March 9, 2011. (Ex. 20 to Hill Dep.). In that evaluation, Kendall gave Hill a rating of 1 out of 5 in the area of "Focus on Profitable Growth" and an overall performance rating of 2 out of 5. (Id. at 2 & 5). The annual evaluation noted that Hill finished 2010 ranked 285th in the SunTrust Cup—in the fourth quintile. (Id. at 2). Kendall noted on the evaluation that Hill "struggled for much of the year in many of her Goal categories" and "has worked to improve by becoming better organized, but sustainable improvement has not occurred." (Id. at 5).

On March 10, 2011—the day after she received her 2010 annual evaluation—Hill called SunTrust's internal "Alert Line" and lodged a discrimination complaint against Kendall. (Ex. 22 to Hill Dep.). During that call, Hill reported that since August 2010 she had "felt intimidated and harassed" by Kendall, noting that on one occasion he called her a "cackling hen" and once referred to her hair—styled in a "natural, twisted pattern"—as "a weekend look." (Id. at 1). Hill also reported in her Alert Line complaint that when Kendall put her on probation, Kendall suggested that she post for another position but she did not want to post for the position that Kendall suggested. (Id.).[3]

---

[3] Kendall states in his declaration that he "thought Hill may be successful in a service oriented role" but "did not think the BBRM (sales oriented role) was the right position for Hill because Hill continually failed to meet her production goals and did not show any signs of sustainable improvement." (Kendall Decl. ¶ 15).

SunTrust Human Resources Advisor Robbin Winters[4] investigated Hill's Alert Line complaint. (Winters Decl., Ex. D to Mot. Summ. J., ¶ 3). During her investigation, Winters interviewed Hill, Kendall, and Chesak; reviewed Hill's performance evaluations and corrective actions; and reviewed Hill's first quarter 2011 goals, noting that "she was among the lowest producers on Kendall's team." (Id. ¶¶ 6–7). Winters advised Kendall to hold off on any further discipline of Hill until the investigation was complete. (Id. ¶ 8; Kendall Decl. ¶ 28). Winters, who is African-American, (Winters Decl. ¶ 2), was unable to substantiate Hill's claims, though she noted that "there was an opportunity for more effective communication between Hill and Kendall," (id. ¶ 9). On March 29, 2011, Winters provided Hill with her final determination as to the investigation, informing Hill that her complaints of intimidation and harassment were not substantiated and that her performance evaluation ratings were "consistent with established performance expectations and practices." (Id. ¶ 11; Ex. 25 to Hill Dep.). Winters also informed Kendall and Mathisen of the outcome of her investigation on March 29 or 30. (Winters Decl. ¶ 12; Kendall Decl. ¶ 32; Mathisen Decl., Ex. C to Mot. Summ. J., ¶ 12).

For the first quarter of 2011, which ended on March 31, 2011, Hill did not meet her performance goals. (Kendall Decl. ¶ 30). She attained 0%, 0%, 31%, 79%, 57%, and 25% of six specific goals. (Id.). In early April 2011, Kendall—with the concurrence of Human Resources Advisor Mathisen—terminated Hill's employment. (Id. ¶ 33; Mathisen Decl. ¶ 15). Kendall replaced Hill with Christina Hartfield,[5] an African-American BBRM who

---

[4] Winters was formerly known as Robbin Grayson, and some record documents refer to her by that name.

[5] The replacement's name is spelled variously in the record as "Hartfield" and "Harfield."

already reported to him but covered different branches.  (Hill Dep. at 212–13; Kendall Decl. ¶ 35).

Hill filed this lawsuit in state court on April 10, 2015, (Compl., Doc. 2), and SunTrust removed it to this Court on June 2, 2015, (Notice of Removal, Doc. 1).  In her Amended Complaint (Doc. 10), Hill alleges that SunTrust violated 42 U.S.C. § 1981 by terminating her based on her race and in retaliation for complaining about discrimination.[6]  SunTrust now seeks summary judgment in its favor on both of these claims, arguing that this case was filed after expiration of the applicable statute of limitations and that both claims fail on the merits even if they were timely asserted.

## II.   Summary Judgment Standards

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).  However, when faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations."  Gargiulo v. G.M. Sales, Inc., 131 F.3d 995, 999 (11th Cir. 1997).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S.

---

[6] The Amended Complaint also asserted claims of race discrimination, age discrimination, and retaliation under the Florida Civil Rights Act. (Doc. 10 at 5–8). Those claims were dismissed based on election of remedies in a previous Order (Doc. 17), and only the § 1981 claims remain for disposition.

317, 322 (1986). "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." Sawyer v. Southwest Airlines Co., 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-51 (1986)).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'" Sawyer, 243 F. Supp. 2d at 1262 (quoting Anderson, 477 U.S. at 251-52); see also Laroche v. Denny's, Inc., 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment."). "[T]he summary judgment rule applies in job discrimination cases just as in other cases. No thumb is to be placed on either side of the scale." Chapman v. AI Transp., 229 F.3d 1012, 1026 (11th Cir. 2000).

## III.   Discussion

### A.   Timeliness

SunTrust first argues that Hill's claims are barred by the applicable four-year statute of limitations.[7] This case was filed on Friday, April 10, 2015, and SunTrust maintains that the statute of limitations began to run more than four years prior to that date. On the summary judgment record, the Court cannot grant summary judgment on this basis.

---

[7] "The statute of limitations in § 1981 claims is that applicable to similar claims under state law." Del. State Coll. v. Ricks, 449 U.S. 250, 255 n.5 (1980). Here, the parties agree that the applicable limitations period under Florida law is four years.

"An adverse employment action is deemed to have occurred when the employer made the final decision and communicated it to the employee." Thomas v. CVS/Pharmacy, 336 F. App'x 913, 915 (11th Cir. 2009) (citing Del. State Coll. v. Ricks, 449 U.S. 250, 258 (1980). SunTrust asserts that it had made the final termination decision and communicated that decision to Hill by April 7, 2011, but the record is not clear on this point.

Kendall attests that on April 7, 2011, he "finalized the decision to terminate Hill" and prepared a termination memo. (Kendall Decl. ¶ 34; Termination Memo, Ex. 8 to Kendall Decl.). His declaration is silent as to when he communicated that decision to Hill. (See Kendall Decl.). Human Resources Advisor Mathisen states in her declaration that the termination decision was finalized "on or about April 7, 2011" and "was effective April 13, 2011." (Mathisen Decl. ¶ 16). The record evidence includes an email sent by Kendall on Wednesday, April 6, 2011, to Human Resources Advisor Georgina Hernandez, noting that Mathisen was out that week and had asked him to forward his termination memo to Hernandez for review. (Ex. 8 to Doc. 32). In that email, Kendall stated: "Should you concur, please let me know by end of business Friday the 8th as I would like to proceed with the [t]ermination on Monday morning"—April 11, 2011. (Id.). Hernandez responded that she would "review and revert soon." (Id.). Neither party has provided any evidence as to when, if ever, Hernandez responded to Kendall.

In her deposition, Plaintiff testified that she believed Kendall fired her on April 7, 2011. (Hill Dep. at 193). She also stated, however, that "[i]t was on a Tuesday, . . . first week of April," (id.), but April 7 was a Thursday, not a Tuesday. Hill further explained that she was on vacation the first week of April and was terminated when she returned. (Hill

Dep. at 212). Later in the deposition, counsel read from a document[8] that stated: "When she returned from vacation on April 12, Mr. Kendall informed her early in the morning that she was being terminated because of performance issues." (Hill Dep. at 248). Hill then again stated that she thought the correct date was April 7 rather than April 12. (Id.).

Although Hill herself testified that she believes she was terminated on April 7, 2011, the Court cannot—construing the evidence in the light most favorable to Hill, as it must at the summary judgment stage—conclude that the record conclusively shows that Hill was terminated prior to April 10, 2011. Hill also maintains that she was terminated on a Tuesday, but April 7 was a Thursday, and no one has suggested that Hill was terminated as early as Tuesday, April 5. Kendall's April 6 email suggests that he had no intention of conveying the termination decision prior to Monday, April 11, and if Hill was terminated on a Tuesday, April 12 would fit that scenario and be consistent with the document quoted by SunTrust's counsel at Hill's deposition. Finally, Mathisen noted that the termination was "effective April 13," and no explanation for that effective date has been provided.

In light of the conflicting evidence over when the termination decision was conveyed to Hill, the question whether Hill's claims are barred by the four-year statute of limitations cannot be resolved at this point. SunTrust's motion cannot be granted on this basis, and the Court will proceed to examine the merits of Hill's claims.

## B.  Disparate Treatment

In her first claim, Hill contends that SunTrust discriminated against her based on her race in violation of 42 U.S.C. § 1981 when it terminated her employment. SunTrust has

---

[8] Only excerpts of Hill's deposition have been filed in the record, and it is not clear what document counsel was reading from at that point in the deposition. It may have been the Amended Complaint, which contains this statement. (See Doc. 10 ¶ 17).

established entitlement to summary judgment on this claim.

"A plaintiff may prove a claim of intentional discrimination through direct evidence, circumstantial evidence, or . . . statistical proof." Rioux v. City of Atlanta, 520 F.3d 1269, 1274 (11th Cir. 2008). Hill has not presented any direct evidence or statistical proof, and the Court thus evaluates her discrimination claim using the burden-shifting framework established by McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and its progeny to determine if Hill can establish her § 1981 disparate treatment claim through circumstantial evidence.[9]

Under the three-part McDonnell Douglas framework, the plaintiff has the initial burden to establish a prima facie case of discrimination by a preponderance of the evidence. McDonnell Douglas, 411 U.S. at 802. "Demonstrating a prima facie case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination." Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997). If the plaintiff establishes a prima facie case, a presumption of discrimination arises. See, e.g., Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981).

If the plaintiff presents a prima facie case and its attendant presumption, the burden "[s]hifts to the employer to articulate some legitimate, nondiscriminatory reason" for its actions. McDonnell Douglas, 411 U.S. at 802. The employer's "burden is one of production, not persuasion; it 'can involve no credibility assessment.'" Reeves, 530 U.S. at 142 (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993)). "If the defendant

---

[9] The McDonnell Douglas framework was developed in the Title VII context, but it applies to § 1981 claims as well. See Turnes v. AmSouth Bank, N.A., 36 F.3d 1057, 1060 (11th Cir. 1994) ("The McDonnell Douglas scheme . . . applies in § 1981 cases involving discriminatory treatment in employment situations.").

articulates one or more such reasons, the presumption of discrimination is eliminated and 'the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.'" Chapman, 229 F.3d at 1024 (quoting Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997)).

"In race-discrimination cases, a plaintiff makes out a prima facie case when [s]he shows by a preponderance of the evidence (1) that [s]he is a member of a protected racial class, (2) that [s]he was qualified for the position, (3) that [s]he experienced an adverse employment action, and (4) that [s]he was replaced by someone outside of h[er] protected class or received less favorable treatment than a similarly situated person outside of h[er] protected class." Flowers v. Troup Cty., Ga., Sch. Dist., 803 F.3d 1327, 1336 (11th Cir. 2015). SunTrust does not challenge that Hill is a member of a protected class, that she was qualified, or that she experienced an adverse employment action. But SunTrust does assert that Hill cannot establish the fourth and final element of a prima facie case.

Hill acknowledges that she was replaced by Christina Hartfield, who also is African-American. (Hill Dep. at 212–13). Thus, she cannot satisfy this element based on her replacement, and she instead asserts that she was treated less favorably than similarly situated Caucasian employees. Hill specifically relies on two comparators, Leah Douglas and Paul Weber—Caucasian BBRMs who also worked under Kendall. Hill contends that performance standards were not applied evenly to all team members and that the 2010 annual evaluations for Hill, Douglas, and Weber reflect this disparity. The Court disagrees.

The 2010 annual evaluations of Hill, Douglas, and Weber reflect that in the area of

"Focus on Profitable Growth," which is weighted for 40% of the overall score on the evaluation—far more than any other area[10]—goal attainments were:

|  | Hill | Douglas | Weber |
|---|---|---|---|
| New Primary Relationships | 75% | 108% | 100% |
| Retained Primary Relationships | 98% | 97% | 96% |
| T & PS[11] | 131% | 112% | 39% |
| New Business DDA Production | 25% | 30% | 35% |
| New Business Other DDA | 17% | 34% | 19% |
| Client Loyalty and Satisfaction | 28% | 73% | 51% |
| New Business Loan/Line/Credit Card | 11% | 54% | 49% |
| New Personal Deposit Line/Loan | 3% | 46% | 40% |
| Loan/Other Fees | 23% | 43% | 31% |

(Hill 2010 Annual Evaluation, Ex. 20 to Hill Dep.; Douglas 2010 Annual Evaluation, Ex. 2 to Doc. 32; Weber 2010 Annual Evaluation, Ex. 3 to Doc. 32). Hill was superior to Douglas and Weber in only two of the nine "Focus on Profitable Growth" areas: Retained Primary Relationships, in which she was only marginally better, and T & PS. Hill rated herself at level 2 for "Focus on Profitable Growth," and Kendall gave her a 1; Douglas and Kendall both rated Douglas a 3; and Weber and Kendall both rated Weber a 2 in this category.

On other areas of the 2010 evaluations, Kendall rated Hill, Douglas, and Weber the same—3—in "One Team Client First" and "Continuous Development"; Hill and Kendall both rated Hill a 2 on "Client-Focused Professionalism," while Douglas and Weber received a 3 and a 4, respectively, from both Kendall and themselves in this area; and in the area of "Risk Management" both Hill and Douglas received a 3 and Weber received a 4. Kendall noted "accountability" as an area of concern in "Core Behaviors" for Hill—a concern that

---

[10] The five areas of the evaluation were weighted: Focus on Profitable Growth, 40%; Client-Focused Professionalism, 15%; One Team Client First, 15%; Continuous Development, 10%; and Risk Management, 20%.

[11] It is not clear from the record what "T & PS" stands for.

McCollum had also noted in 2008, (see Ex. 10 to Hill Dep., at 4)[12]—while no areas of concern were noted for either Douglas or Weber on any "Core Behaviors."  The overall performance ratings:  2 for Hill and 3 for both Douglas and Weber—are a product of the weights and scores in the five evaluation areas.

Hill's assertion that the 2010 annual evaluations suggest different application of scoring among similar performers is rejected.  Hill does not contest the sales numbers or the resulting goal attainment percentages, and in the most heavily weighted category, Focus on Profitable Growth, she objectively performed worse—often far worse—than both Douglas and Weber.  Douglas's and Weber's sales performance was better than Hill's, and thus Hill has not presented evidence of a similarly situated person outside of her protected class who was treated more favorably than she was.  She has not presented a prima facie case of discrimination under the McDonnell Douglas paradigm.

Even if Hill had presented a prima facie case of race-based termination, SunTrust has presented a legitimate nondiscriminatory reason for terminating her—failure to improve her job performance.  SunTrust is thus entitled to summary judgment unless Hill presents evidence creating a genuine issue of material fact regarding whether SunTrust's asserted reason is a mere pretext for race discrimination.  See, e.g., Chapman, 229 F.3d at 1024-25 ("If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim.").

In determining whether an issue has been raised as to pretext, this Court "must, in

---

[12] Hill does not contend that McCollum discriminated against her.  The only person she accuses of discrimination is Kendall.  (See Hill Dep. at 17–18).

14

view of all the evidence, determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered legitimate reasons were not what actually motivated its conduct." Combs, 106 F.3d at 1538 (citation and internal quotation omitted).  This determination involves an "evaluat[ion of] whether the plaintiff has demonstrated 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" Id. (quoting Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1072 (3d Cir. 1996)).  "The inquiry into pretext centers upon the employer's beliefs, and not the employee's own perceptions of [her] performance." Holifield, 115 F.3d at 1565.

Under these standards, Hill has failed to present evidence creating a genuine issue of material fact regarding pretext.  In arguing pretext, Hill relies again on Paul Weber's 2010 annual evaluation, arguing that she and Weber "had the same exact performance that year," yet Weber received a rating of 3 and she only a 2.  (Doc. 32 at 10).  But as discussed earlier, their performance was not the same even as an objective matter, and Hill presents no other argument on the issue of pretext.  Furthermore, Hill had received similar poor performance reviews from a prior supervisor, McCollum, whom she does not accuse of discrimination, and other BBRMs, including Douglas, were also placed on corrective action plans in 2011 based on their sales performance.  (See Exs. 32–35 to Hill Dep.).[13]

In sum, under the McDonnell Douglas framework Hill has not presented evidence

---

[13] Prior to her deposition, Hill was not aware that these other BBRMs were also placed on corrective action plans.  (See Hill Dep. at 227, 229, & 233).

creating a genuine issue of material fact as to whether her termination was due to a race-based discriminatory animus. See Tidwell v. Carter Prods., 135 F.3d 1422, 1427 (11th Cir. 1998) (finding no issue raised as to pretext where evidence presented did "not provide the needed 'more than a mere scintilla of evidence' to survive a motion for judgment as a matter of law" and did "not present a substantial conflict in the evidence as to [the employer's] purported reason for terminating [the plaintiff] . . . as to support a jury question"); Weston-Smith v. Cooley Dickinson Hosp., Inc., 282 F.3d 60, 70 (1st Cir. 2002) (affirming summary judgment for employer, noting that the "proffered reasons for [the plaintiff's] termination are plausible and coherent, and neither [the plaintiff's] criticisms of those reasons nor her independent circumstantial evidence of an improper motive, whether taken apart or together, are sufficient to require a jury trial").

Hill also asserts that even if she cannot satisfy the McDonnell Douglas framework, she still survives summary judgment. She relies on Smith v. Lockheed-Martin Corp., 644 F.3d 1321 (11th Cir. 2011), in which the Eleventh Circuit held that "the plaintiff will always survive summary judgment if [s]he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." Id. at 1328. The Smith panel opined that "[a] triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'" Id. (footnote omitted) (quoting Silverman v. Bd. of Educ., 637 F.3d 729, 734 (7th Cir. 2011)). The court concluded that the plaintiff in that case "did not need to rely on the McDonnell Douglas presumption to establish a case for the jury" because "the record contained sufficient evidence to allow a jury to infer that Lockheed fired [him] because he is white." Id.

Smith does not assist Hill.  Although the Smith court held that the plaintiff did not need to rely on the McDonnell Douglas prima facie case elements to survive summary judgment because of other circumstantial evidence supporting an inference of race-based discrimination, there is an absence of such evidence in the case at bar.  Hill does not specify what evidence she contends supports her claim outside the McDonnell Douglas framework, (see Doc. 32 at 10-11), but the record does not support an inference of discrimination.

The only record evidence that does not pertain to job performance is Kendall's reference to Hill as a "cackling hen" and his comment on one occasion that Hill's hair looked like "a weekend look."  In her deposition, Hill could not recall whether these comments were made before or after she received the Verbal Warning and Written Warning, (Hill Dep. at 137), but regardless of when they were made these comments do not support an inference of racial discrimination.  Kendall admitted that he called both Hill and a Caucasian employee, Stacy Spruce, "cackling hens," explaining that he did so because they "were grouping together and gossiping."  (Kendall Decl. ¶ 26).  Hill acknowledges that Kendall also referred to Spruce as a cackling hen; Hill spoke to Spruce about it after the incident, and Spruce was not offended by it and had been called a cackling hen previously.  (Hill Dep. at 103).  The Court finds no basis to attribute any racial animus to this remark.

With regard to Kendall's comment about her hair, Hill testified in her deposition that Kendall told her "[y]ou don't need to have those things in your hair" and "[t]hat's a weekend look."  (Id. at 109).[14]  Hill explained that ever since she had known Kendall she had "been

---

[14] The Amended Complaint alleges that Kendall referred to Hill's hair as "kinky African hair," (Doc. 10 ¶ 10), but in her deposition Hill confirmed that Kendall did not use that phrase, (Hill Dep. at 213–14).

wearing [her] hair naturally" and "[t]here was nothing in my hair except for my hair, . . . I twist my hair, . . . it's my hair, and I untwist it, and it's a style." (Id.). Kendall attests in his declaration that when he commented that Hill's hair looked "like a weekend look" he meant it as a compliment because Hill's hair "looked styled" and Hill did not typically style her hair. (Kendall Decl. ¶ 25). Again, the Court cannot discern racial animus from this comment, and even if it could, this stray remark would not be sufficient to survive summary judgment.

In sum, Hill has not presented a prima facie case of discrimination under the McDonnell Douglas framework, and even if she had SunTrust has articulated a legitimate, non-discriminatory reason for terminating her and Hill has not presented evidence raising a genuine issue of material fact as to pretext. Further, Hill's efforts to survive summary judgment outside the McDonnell Douglas analysis fail. Accordingly, SunTrust is entitled to summary judgment on Hill's claim of race-based termination.

### C.   Retaliation

In her second claim, Hill alleges that SunTrust, through Kendall, terminated her in retaliation for her complaint about race discrimination. The Court analyzes this claim under the burden-shifting framework of McDonnell Douglas as well.

"A plaintiff establishes a prima facie case of retaliation by showing that:  (1) she 'engaged in statutorily protected activity'; (2) she 'suffered a materially adverse action'; and (3) there was a causal connection between the protected activity and the adverse action.'" Chapter 7 Tr. v. Gate Gourmet, Inc., 683 F.3d 1249, 1258 (11th Cir. 2012). In its summary judgment motion, SunTrust challenges only the satisfaction of the causal connection element.

Generally, a short time lag between protected activity and adverse action can be enough to satisfy the causal connection element. Brungart v. BellSouth Telecomms., Inc.,

231 F.3d 791, 799 (11th Cir. 2000).  Here, Hill complained about Kendall on March 10 and was terminated approximately one month later.  However, other circumstances can negate the inference of causation that may arise from temporal proximity.  See Hankins v. AirTran Airways, Inc., 237 F. App'x 513, 520 (11th Cir. 2007) (nothing that "close temporal proximity between two events, standing alone, is not a panacea, absent any other evidence that the employment decision was causally related to the protected activity").

Hill made her complaint of discrimination the day after she received her poor 2010 annual review and seven months into implementation of progressive discipline based on undisputedly poor sales performance.  "[A]nti-retaliation provisions do not allow employees who are already on thin ice to insulate themselves against termination or discipline by preemptively making a discrimination complaint."  Alvarez v. Royal Atl. Developers, Inc., 610 F.3d 1253, 1270 (11th Cir. 2010).  Here, SunTrust "had legitimate non-[retaliatory] reasons to fire [Hill] before she complained, and it remained free to act on those reasons afterward."  Id.; cf. Smith v. Hyundai Motor Mfg. Ala., LLC, Civil Action No. 2:06cv966-ID, 2008 WL 1698207, at *12 (M.D. Ala. Apr. 9, 2008) ("Defendant was not expected to halt or forego its disciplinary proceedings simply because, on the heels of Defendant's contemplated termination of Plaintiff, Plaintiff screamed retaliation.").  Kendall was told to hold off on further discipline while Hill's complaint was investigated, and by the time the investigation was complete at the end of March, her probationary period had ended and the first quarter sales results showed continued failure to attain sales goals.  She was then terminated.

On this record, the Court cannot conclude that a causal connection has been established, and even assuming that temporal proximity is enough to satisfy the prima facie

case, Hill's retaliation claim fails at the other stages of the <u>McDonnell Douglas</u> analysis. SunTrust has articulated a legitimate reason for terminating Hill's employment, and Hill has failed to present evidence creating a genuine issue of material fact as to whether that reason is a mere pretext for retaliation.  Summary judgment will be granted in favor of SunTrust on Hill's retaliation claim.

## IV.    Conclusion

It is **ORDERED** and **ADJUDGED** as follows:

1.    SunTrust's Motion for Summary Judgment (Doc. 31) is **GRANTED** as to both of Hill's remaining claims.

2.    The Clerk is directed to enter a judgment providing that Plaintiff, Ann Marie Hill, takes nothing on any of her claims against Defendant, SunTrust Bank.  Thereafter, the Clerk shall close this case.

**DONE** and **ORDERED** in Orlando, Florida, on January _9_, 2017.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record